Filed 12/5/22 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ATLANTIC RICHFIELD COMPANY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL VALLEY REGION,<br><br>Defendant and Respondent. | C093124<br><br>(Super. Ct. No. 34-2014-80001875-CU-WM-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 15, 2022, be modified as follows:

On page 35, footnote 6, the last sentence of the footnote, beginning with "In any event," is deleted and the following is inserted in its place:

We do acknowledge that two Regional Board employees appear to have believed in 2011 and 2013 that the Regional Board was at least potentially responsible for part of the pollution. This is consistent with the trial court's observations regarding the possibility of financial exposure. However,

1

contrary to ARCO's position in its petition for rehearing, this does not mean we are bound by the trial court's "factual finding of bias."  For the reasons already expressed, no such finding was made.  In any event, while ARCO is correct that we employ the substantial evidence standard of review to factual findings, whether the facts of a given case amount to a due process violation is primarily a question of law.  Indeed, in *Today's Fresh Start*, the trial court found a financial bias violating due process and our Supreme Court independently determined whether due process was violated.  (See, e.g., *Today's Fresh Start, Inc., supra*, 57 Cal.4th at p. 211 [trial court finds board not impartial decisionmaker]; *id*. at pp. 212-219 [independently determining whether due process was violated].)

There is no change in the judgment.  Appellant's petition for rehearing is denied.


FOR THE COURT:



  /s/
DUARTE, Acting P. J.




  /s/
HOCH, J.




  /s/
EARL, J.

2

Filed 11/15/22 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ATLANTIC RICHFIELD COMPANY, | C093124 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-80001875-CU-WM-GDS) |
| v. | |
| CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL VALLEY REGION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge.  Affirmed.

Farella Braun + Martel, James H. Colopy, John M. Ugai, Tori Timmons; Davis Graham & Stubbs, Benjamin B. Strawn; Arnold & Porter Kaye Scholer and Kirk Jenkins for Plaintiff and Appellant.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor, Russell B. Hildreth and Jeffrey P. Reusch, Deputy Attorneys General, for Defendant and Respondent.

1

This case returns to us for a second time.  In *Atlantic Richfield Co. v. Central Valley Regional Water Quality Control Bd.* (2019) 41 Cal.App.5th 91 (*Atlantic Richfield*), we reversed the trial court's judgment overturning a cleanup order issued by the California Regional Water Quality Control Board, Central Valley Region (Regional Board).  (*Id*. at p. 100.)  As the name suggests, the cleanup order directed Atlantic Richfield Company (ARCO) to remediate hazardous waste associated with an abandoned mine in Plumas County.  The mine was owned by the Walker Mining Company, a subsidiary of ARCO's predecessors in interest, International Smelting and Refining Company and Anaconda Copper Mining Company (International/Anaconda).  (*Id*. at pp. 93-95.)  We held the trial court improperly applied the test articulated in *United States v. Bestfoods* (1998) 524 U.S. 51 (*Bestfoods*) for determining whether a parent company is directly liable for pollution as an operator of a polluting facility owned by a subsidiary.

Imposition of direct liability under *Bestfoods* requires the parent company to have managed, directed, or conducted operations related to leakage or disposal of pollution at the facility in question; "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility."  (*Bestfoods*, *supra*, 524 U.S. at p. 72.)  The trial court improperly limited its review of the evidence to International/Anaconda's participation in waste disposal activities at the mine, concluding the *Bestfoods* standard is met only where the parent company participated in or directed activities directly involving waste disposal or compliance with environmental regulations.  (*Atlantic Richfield*, *supra*, 41 Cal.App.5th at p. 96.)  As we explained, however, "[i]f a parent corporation had its fingerprints all over the activities of a facility that resulted in the spewing of hazardous waste, it does not make sense to insulate it from liability because it eschewed the direction of any efforts the subsidiary might have made otherwise to dispose of hazardous waste."  (*Id*. at p. 97.)  We remanded the matter to the trial court for

"a determination of ARCO's liability under the proper standard of eccentric control over *any* category of mining activity resulting in toxic discharge, including the [Regional] Board's claim that the activity itself of disturbing the rock strata can generate toxic waste." (*Id*. at p. 100.)

On remand, the trial court entered judgment in favor of the Regional Board, concluding "[t]he record supports a determination of eccentric control of mining 'operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste.' " ARCO appeals, contending: (1) the trial court improperly applied *Bestfoods* to the facts of this case, resulting in a finding of liability that is unsupported by substantial evidence; (2) the Regional Board abused its discretion by failing to exclude certain expert testimony as speculative; (3) the Regional Board's actual financial bias in this matter requires invalidation of the cleanup order for violation of due process; and (4) the cleanup order erroneously imposed joint and several liability on ARCO.

We affirm. As we explain, the evidence in the record is more than sufficient to support the trial court's conclusion that agents of International/Anaconda, wearing no hat other than that of the parent company, exercised eccentric control over mining operations at the Walker Mine, resulting in the discharge of toxic waste.[1] ARCO's evidentiary claim also lacks merit. The Regional Board did not abuse its discretion in considering the challenged expert testimony because that testimony was not "based on a leap of logic or conjecture"; nor was it " 'clearly invalid and unreliable' expert opinion." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772 (*Sargon*).) We also reject ARCO's assertion that its due process rights were violated because the Regional Board was not a fair and neutral arbiter of whether or not a cleanup

---

[1]      In addressing this claim, we also reject ARCO's related claim that the trial court erroneously denied its request for a statement of decision.

3

order should issue in the first instance. ARCO has not carried its appellate burden of showing the Regional Board possessed a financial interest in issuing the order. Finally, nothing in the statutory scheme prevents the Regional Board from ordering ARCO, and ARCO alone, to clean up the site contaminated by its predecessors.

BACKGROUND

We previously provided an overview of the historical facts and summary of the Regional Board's cleanup order in *Atlantic Richfield*, *supra*, 41 Cal.App.5th 91:

"J. R. Walker began developing the Walker Mine in 1909, located to the north of Quincy and Portola in Plumas County. It is within the drainage of a watershed feeding ultimately into the north fork of the Feather River.

"The Walker Mining Company took title in 1915 and commenced mining in 1916. At one point in the 1930s, this was the largest copper mine in California.

"International Smelting and Refining Company was a wholly owned subsidiary of the Anaconda Copper Mining Company, which later swallowed International in a merger. International/Anaconda acquired a controlling interest in the Walker Mining Company in 1918. Ultimately, ARCO became a successor through Anaconda's merger with an ARCO subsidiary in 1977 and the subsidiary's merger with ARCO in 1981. [Citation.]

"The mine ceased production in 1941 and ceased all operations in 1943, after producing six million tons of ore. The assets of the Walker Mining Company were sold in bankruptcy proceedings in 1945 and transferred to subsequent owners over the decades; the [Regional] Board reached a settlement with the current owner of the property in 2004, which at present appears to be an inactive and insolvent corporation. By virtue of this and an earlier settlement against a previous owner, the [Regional] Board has a right of access to the property under which it can authorize ARCO to conduct remediation activities.

"The mine has 13 miles of flooded underground workings, comprising a total void volume estimated at 543 million gallons. The mine openings and tailings on the site

4

discharge soluble copper and acidic mine drainage into surface waters, at times eliminating aquatic life 10 miles downstream from the mine. In 1987, the [Regional] Board installed a concrete plug at a mine opening that was a primary source of mine leakage, which has eliminated most of the direct discharge but is causing a buildup of contaminated water inside the mine that is leaching into groundwater, and the mining waste on the surface also continues to be a source of water pollution.

"The [Regional] Board concluded that the mine and its tailings 'have discharged metals and acid mine drainage' into the watershed 'from at least the time production ceased in 1941, if not earlier.' The ARCO predecessors 'concurrently managed, directed, or conducted operations specifically related to the leakage or disposal of waste' in tandem with the Walker Mining Company. The activities 'included exploration, ore location, mine development work . . . , and removal of ore, all of which directly resulted in the condition of discharge . . . at the mine and tailings.' This involvement 'went well beyond what is normally expected of a . . . corporate parent.' The [Regional] Board also concluded that the ARCO predecessors directly discharged waste from their own mining activities from 1916 to 1918. It therefore ordered ARCO to investigate and remediate the hazardous waste associated with the Walker Mine." (*Atlantic Richfield*, *supra*, 41 Cal.App.5th at pp. 94-95.)

The Regional Board's cleanup order was issued in March 2014. ARCO petitioned the trial court to overturn the order. The trial court granted the petition in January 2018. (*Atlantic Richfield*, *supra*, 41 Cal.App.5th at pp. 93-94.) As stated previously, in *Atlantic Richfield*, we reversed and remanded the matter to the trial court to determine "ARCO's liability under the proper standard of eccentric control over *any* category of mining activity resulting in toxic discharge," not just activity involving waste disposal or environmental regulation compliance. (*Id*. at p. 100.)

On remand, the Regional Board relied on the following evidence in the administrative record to support its conclusion that International/Anaconda exercised

eccentric control over ore extraction at the Walker Mine, resulting in the toxic pollution described above:

In a September 1923 letter from Paul Billingsley, a geologist at Anaconda, to J. O. Elton, who served both as general manager of International's smelter in Utah and as vice president of the Walker Mining Company, Billingsley expressed concern that the Walker Mining Company's manager, V. A. Hart, was not following the "recommendations" of Anaconda's geological department. As the Regional Board's industrial historian, Fredric L. Quivik, Ph.D., explained, "the office of vice president of a subsidiary is often key in giving the parent a conduit for directing the subsidiary's manager of operations."

In a letter from Anaconda's chief geologist, Reno Sales, to Billingsley, dated six days after the letter from Billingsley to Elton, Sales referred to these recommendations as "instructions" and more forcefully stated the problem from the perspective of Anaconda's geological department: "I don't see how things will be any better unless Hart is made to follow instructions. . . . I get rather provoked at the frequent request that you . . . go there and as far as I can see the developments at the mine are carried on just about as Hart wants them." The letter continued: "Hart insists upon being his own geologist and apparently doesn't want to take any advice or instructions from this office. I insist that if we are to be held responsible, Mr. Hart is going to do things the way we want him to, he is going to keep us informed of developments so that we can watch what is going on from our department rather than waiting for these difficulties to come up through Elton. It should not be necessary for Elton to be bothered with matters of this sort and he can be relieved of it if he will make certain that Hart obeys instructions as to prospecting and development given by this department."

The following month, Billingsley wrote to Hart with specific "recommendations" for excavating the mine in search of ore, e.g., "Continue exploration of shear zone at North end of 600 level by means of straight drift with cross-cuts in both directions at

6

intervals of 100 feet."  Billingsley also stated:  "You may consider this letter as your authorization to start the above work."

Additional recommendations from the Anaconda geological department were provided both to Elton and to Walker Mining Company's new manager, I. L. Greninger, in 1924.  In November of that year, Sales wrote to William Wraith, who was both an executive at Anaconda (in charge of overseeing various mining projects) and also a vice president of the Walker Mining Company (along with Elton).  A portion of this letter reads:  "I know the Geological Department will not be held responsible for mining operations at the Walker.  I do not want you to feel that I am criticizing the mining end.  I may differ from you in opinion as to the proper method of prospecting certain areas, but in the final say so as to how it will be done I certainly am always glad and willing to leave it to the mine management.  But the Geological Department has in the past been held responsible, to some degree at least, for prospecting and development work, and whenever I see drifts run in waste when they should be in ore, or at least should be in the vein; and crosscuts run that are useless, I am going to kick, anyhow as long as this department has anything to do wit[h ]it."

In May 1925, Sales wrote to Tom Lyon, a geologist at International, asking Lyon to write a letter to the Walker Mining Company's new manager, Herbert R. Tunnell, adding:  "I want Tunnell to see your letter so that he may fully understand and agree with the recommendations made."  A series of August 1925 letters between Lyon and Tunnell indicate that Lyon, on behalf of International, was now approving recommendations made by Tunnell with respect to specific mining activity at the Walker Mine.

For example, an August 25 letter from Lyon indicates that he received a previous letter from Tunnell "regarding the proposed development work" and then provides detailed instructions regarding crosscutting at various ends and depths of the mine, adding:  "The location for winzes that you have selected are satisfactory.  I think, however, that the work should all be done in the vein.  The water problem should not be

7

worse in the vein than in the schist as one is as porous as the other and the only water that should be expected would come from cracks or faults which are liable to occur in either the vein or the schist." In response, Tunnel wrote to Lyon: "Regarding the proposed shaft and winze, I believe we should do the preliminary work at once and as you approve the locations suggested in my letter we will get the hoists installed as soon as possible." The following day, apparently before receiving the previous letter, Lyon wrote to Tunnell, stating: "By this time you have my letter of August 25th regarding the development work proposed by you. I think that letter will give you authority to proceed with the winzes as you are able. Crosscutting east and west at the north end of the property may proceed when the north drift on the six hundred [level] has advanced far enough to be beneath the central portion of the large mineralized area exposed on the surface."

The following month, Lyon wrote to Tunnell: "Mr. Billingsley is now back and will visit the Walker mine next week and will take up the matter of development work at that time. [¶] During the interval you are authorized to drift north and south on the ore disclosed by crosscut 647 S." Tunnell thereafter acknowledged receipt of this authorization.

In February 1926, Tunnell wrote to Billingsley, now International's chief geologist, providing an update on work being done at the Walker Mine. Tunnell explained that the work was being done with the approval of William Daly, Anaconda's top mining engineer, and closed the letter with: "I hope the work outlined above meets with your approval . . . ."

The next piece of correspondence relied upon by the Regional Board in support of International/Anaconda exercising eccentric control over mining operations at the Walker Mine is from more than a decade later, March 1937. In the interim, the Great Depression weakened the market for copper, resulting in suspension of operations at the Walker

8

Mine from 1932 to 1935. The mine operated intermittently thereafter until it ceased production in 1941.

In March 1937, Seth Droubay, the Walker Mining Company's chief engineer and geologist, wrote to Lyon, now International's chief geologist, presenting a "proposed development program" for the Walker Mine. Ten days later, Lyon indicated Droubay's "recommendations" were approved in a letter to John F. Dugan, International's superintendent of mines.

In a December 1938 letter from Sales to Lyon, Sales informed Lyon that a certain specific proposal from Droubay, i.e., "the hanging wall crosscut on the 1000 foot level to be driven from 1017 Drift at a point just to the north of coordinate 15800," was approved, but "we do not approve of the work on or from the 1100 foot level as outlined by Droubay." Two days later, Dugan wrote a letter to Clyde E. Weed, Anaconda's general manager of mines, indicating that he had received this approval, but seeking clarification with respect to "whether or not you intended to do any drilling" once the crosscut was cut.

In January 1939, Droubay submitted additional recommendations regarding specific mining activities to Lyon and indicated he would also send them to Dugan, "and tell him they are subject to your approval." That April, Droubay wrote to Lyon confirming three of these recommendations were completed.

In May 1941, Dugan wrote to Sales asking whether further development, "either by drifting, crosscutting or diamond drilling," would be occurring on the 1,200-foot level of the mine. In response, Sales informed Dugan that he would discuss the matter with Weed and "advise you of our decision." In July, having not yet received a decision, Dugan again wrote to Sales seeking "your early decision as to development work, for if no further work is contemplated on the 1200, we will salvage the equipment . . . ." Dugan also attached a copy of a letter he received from Henry Hartmann, the Walker Mining Company's new manager, which apparently also inquired about abandonment of

9

the 1,200-foot level.  Sales responded:  "I have talked with Weed about the 1200 Walker. We concur in the opinion of yourself and Hartmann, that this level should be temporarily abandoned.  This means that you may pull out such tracks, pipes, etc., as is deemed advisable, and also stop pumping from that level."

As Dr. Quivik explained, neither Sales, Lyon, nor Weed had any official role at the Walker Mining Company.

The Regional Board argued below:  "These documents show active direction of mining activity, leading to leakage or disposal of waste, going far beyond mere monitoring of a financial investment.  International and Anaconda employees were making critical decisions about where to mine, how to mine, and when to stop mining, demonstrating total control of the mining enterprise and day-to-day operations."

The trial court agreed with the Regional Board and rejected ARCO's specific argument that International/Anaconda merely offered solicited "advice" to the Walker Mining Company concerning the first two phases of mining activity, "development and exploration," which "did not result in the pollution at issue" in this case.  The trial court explained:  "While ARCO repeatedly argues any eccentric control merely concerned exploration and development, the Court finds ARCO's use of the term 'development' is too broad and actually encompasses activities that constituted ore extraction. International/Anaconda clearly took a role in the day to day happenings at Walker mine that exceeded a traditional parent corporation role such that they managed, directed, or conducted operations on behalf of Walker Mining Company.  (See *Bestfoods*, *supra*, 524 U.S. at pp. 66-67.)  The Court finds that this control occurred in phase three of mining, ore extraction, which activities resulted, at least in part, in the toxic discharge at issue in the [cleanup order]."

Additional relevant portions of the trial court's ruling, as well as evidence adduced by ARCO during the hearing before the Regional Board, will be set forth in the discussion portion of this opinion, to which we now turn.

10

DISCUSSION

## I

### *ARCO's Direct Liability for the Pollution*

ARCO's central contention in this appeal is that the judgment must be reversed because the trial court incorrectly applied *Bestfoods*, *supra*, 524 U.S. 51, to the facts of this case, resulting in a finding of liability that is unsupported by substantial evidence. ARCO is mistaken.

### A.

### *Standard of Review*

A trial court reviews a cleanup order issued under Water Code[2] section 13304 using the independent judgment standard of review. (*Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1111-1112 (*Sweeney*).) " 'In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' [Citation.]" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 879 (*Building Industry*).) Unlike substantial evidence review, the trial court " 'does not defer to the fact finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance. [Citation.] The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding actually was correct.' [Citation.]"

---

[2]     Undesignated statutory references are to the Water Code.

(*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 188.)

On appeal, "this court reviews the trial court's decision on the [cleanup order] for substantial evidence supporting the *trial court's* findings." (*Sweeney*, *supra*, 61 Cal.App.5th at p. 1112; *Barclay Hollander Corp. v. California Regional Water Quality Control Bd.* (2019) 38 Cal.App.5th 479, 498 (*Barclay Hollander*).) "In substantial evidence review, the reviewing court defers to the factual findings made below. It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial—or, as it is often put, whether any rational finder of fact could have made the finding that was made below. If so, the decision must stand." (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435.)

Questions of law, of course, are reviewed de novo. "[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." (*Building Industry*, *supra*, 124 Cal.App.4th at p. 879, fn. omitted.)

With these standards in mind, we shall elucidate the *Bestfoods* standard and then determine whether or not substantial evidence supports the trial court's dispositive findings, specifically that ARCO's predecessors, International/Anaconda, "managed, directed, or conducted operations" at the Walker Mine that "occurred in phase three of mining, ore extraction, which activities resulted, at least in part, in the toxic discharge at issue in the [cleanup order]."

**B.**

***ARCO's Request for a Statement of Decision***

ARCO claims the trial court erroneously denied its request for a statement of decision, and therefore, "Code of Civil Procedure section 634 does not permit [this court] to imply any findings in the [Regional] Board's favor."[3]  We disagree.

"The time for requesting a statement of decision is governed by Code of Civil Procedure section 632 . . . , which provides in pertinent part as follows:  'The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision.' "  (*In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 977 (*Marriage of Gray*).)  "A hearing on a petition for writ of mandamus is a 'trial of a question of fact' for purposes of [this section]."  (*Kearl v. Board of Medical Quality Assurance* (1986) 189 Cal.App.3d 1040, 1050 (*Kearl*); see also *Bevli v. Brisco* (1985) 165 Cal.App.3d 812, 820 (*Bevli*).)

The hearing before the trial court following our remand of the matter occurred on August 21, 2020, and lasted 79 minutes.  An 18-page ruling was filed on September 4. On September 23, ARCO filed a request for a statement of decision, seeking "the factual and legal bases" for 46 specific "controverted issues" covering seven topics, from

---

[3]    The Regional Board asserts this argument is "waived," or more accurately, forfeited (see *People v. Williams* (1999) 21 Cal.4th 335, 340, fn. 1), because ARCO did not properly raise this claim in its opening brief.  The argument that ARCO's request for a statement of decision was improperly denied was made in the section of the brief detailing the procedural background, not in the argument section of the brief, and the subsection raising this claim does not inform this court what relief ARCO is seeking for this purported error.  That information is provided in a footnote in the standard of review section.  In ARCO's reply brief, however, the argument is presented under a separate heading, as are each of the other arguments.  While the opening brief's organizational structure is less than ideal, we do not consider the argument forfeited.

*Bestfoods* liability to the admissibility of Dr. Quivik's expert testimony to the doctrine of laches. Two days later, the trial court denied the request as untimely, explaining: "Because the trial (a hearing on the merits) in this matter concluded within one calendar day, the request needed to be made prior to the submission of the matter for decision. [Citations.] Here, the request was made 33 days after the Court took this matter under submission and 15 days after the Court served its final ruling. Accordingly, [ARCO's] request is denied as untimely." ARCO then filed a motion for new trial based solely on the trial court's denial of its request for a statement of decision. The trial court denied this motion as well.

Relying on *Bevli, supra*, 165 Cal.App.3d 812, ARCO argues its request for a statement of decision was timely. In *Bevli*, the trial judge stated on the record that he had spent 13 hours reading the administrative record and the Court of Appeal concluded that the time spent reviewing the record must be considered "trial time for the purposes of findings under Code of Civil Procedure section 632." (*Id*. at p. 822.) Similarly, ARCO argues, it would be "impossible" for the trial in this case to have lasted only one day because the hearing itself lasted 79 minutes, "[p]reparation of the 18-page ruling surely required several hours," and "[e]ven with an improbable assumption that the Court needed only four hours to prepare its ruling, that would leave two hours and 41 minutes to review the 11,672-page record, which would mean reading 4,349 pages per hour, or 72 pages per minute, or less than one second per page–a physical and mental impossibility."

ARCO's reliance on *Bevli* is misplaced for two reasons. First, Code of Civil Procedure section 632 was amended in 1987, after *Bevli* was decided, to include within its ambit "a trial taking eight hours over more than one calendar day," thereby making clear that "an eight-hour trial is considered a one-day trial." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 63.) The *Gorman* court explained: "The reality is that trial judges spend additional time off the bench preparing for hearings, researching the law, and reading motions and briefs, but the statute indicates an intent not

to count that time as trial time.  Otherwise the trial judge would have to submit timesheets to the parties in a case so they would know when to request a statement of decision.  The parties may be expected to know and add up the time they have spent in court hearings on a case, but not how long the judge has considered the case outside of the courtroom." (*Ibid.*)

In *Marriage of Gray*, *supra*, 103 Cal.App.4th 974, after noting that *Bevli* was decided before the 1987 amendment to Code of Civil Procedure section 632, this court distinguished *Bevli* because it involved an administrative mandamus proceeding and "decline[d] to extend *Bevli*'s timing rule to other civil proceedings . . . in light of the 1987 amendment," explaining:  "We cannot realistically expect trial judges to keep stopwatches to record time spent off the bench in chambers, a home office, or at the kitchen table studying the law and evidence.  Rather, the eight-hour rule in section 632 requires a simple and obvious mode of timekeeping that everyone, including attorneys, can keep track of.  This means that, for purposes of keeping time of trial under section 632 in civil proceedings other than administrative mandamus (an issue not before us), the time of trial means the time that the court is in session, in open court, and also includes ordinary morning and afternoon recesses when the parties remain at the courthouse.  It does not include time spent by the judge off the bench without the parties present—lunch, for example—except for such routine recesses as occur during the day.  Measured by this test, appellant has not shown the trial court erred in its finding that the instant trial lasted less than eight hours over more than one day." (*Marriage of Gray*, at pp. 979-980.)

Unlike *Gorman* and *Marriage of Gray*, this case arises out of a petition for writ of mandate seeking to overturn an order issued by an administrative agency.  However, because we are in agreement with everything those decisions had to say about the 1987 amendment to Code of Civil Procedure section 632, we must question the continuing validity of *Bevli*, even where a trial court must review relevant portions of a lengthy administrative record.

15

In any event, even assuming *Bevli* remains good law, and "trial [time] included not only the hearing but the time spent in reviewing the administrative record," in this case, as was also the case in *Kearl*, *supra*, 189 Cal.App.3d 1040, "the record does not reflect the amount of time expended by the trial court in this regard." (*Id*. at p. 1051.) The *Kearl* court explained: "It is fundamental that an appellant 'must affirmatively show error by an adequate record. . . . Error is never presumed. . . . "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent . . . ." (Orig. italics.)' [Citation.] . . . This court cannot speculate as to the amount of time spent. [Citation.] [¶] Inasmuch as petitioner has not met his burden of affirmatively showing error on the record, this court must presume the lower court's ruling was correct, i.e., that the trial lasted less than one day and petitioner's request for a statement of decision was untimely." (*Id*. at pp. 1051-1052.)

ARCO similarly asks this court to speculate about the amount of time the trial court spent reviewing the admittedly lengthy administrative record in this case. To be sure, reading each of nearly 12,000 pages of administrative record in less than eight hours would have been an impossible feat, but we cannot speculate that the trial court read each and every page. We must be realistic. Each page of an administrative record is not created equal. It would not have been impossible to read the portions of administrative record that we have found to be important to our decision in this appeal in that amount of time. Because it would require sheer speculation on our part to divine the amount of time the trial court actually spent reviewing the administrative record, we must presume the "trial" in this case lasted less than eight hours. ARCO has not carried its appellate burden of demonstrating its request for a statement of decision was timely.

16

## C.

### *The* Bestfoods *Standard*

In *Bestfoods*, *supra*, 524 U.S. 51, the United States Supreme Court held a corporate parent of a subsidiary that operates a polluting facility may not be held liable for the pollution solely because it actively participated in and exercised control over the subsidiary; such indirect liability may not be imposed unless the corporate veil may be pierced. (*Id*. at p. 55.) However, "a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." (*Ibid*.) With respect to direct operator liability, the court clarified, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." (*Id*. at pp. 66-67.)

Thus, where the alleged operator is a corporate parent, " '[t]he question is not whether the parent operates *the subsidiary*, but rather whether it operates *the facility*, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. . . .' [Citations.]" (*Bestfoods*, *supra*, 524 U.S. 51 at p. 68, italics added.) Operating a facility, the court further clarified, "obviously mean[s] something more than mere mechanical activation of pumps and valves, and . . . includ[es] the exercise of direction over the facility's activities." (*Id*. at p. 71.) However, it is not enough that a corporate parent places its own high-level officials in key positions at the subsidiary, and those individuals conducted operations at the facility. This is because " 'directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately . . . .' [Citations.]" (*Id*. at p. 69.) At the same time, parental operation of the facility occurs where "the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture," or where "a dual officer or director . . . depart[s] so far from the norms of parental

17

influence" over the subsidiary that his or her actions in operating the facility actually "serve the parent, even [though] ostensibly acting on behalf of the subsidiary," or where "an agent of the parent with no hat to wear but the parent's hat . . . manage[s] or direct[s] activities at the facility." (*Id*. at p. 71.)

The court concluded its explication of the proper standard for imposing direct operator liability by explaining: " 'Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.' [Citation.] The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." (*Bestfoods*, *supra*, 524 U.S. 51 at p. 72.)

Applying this standard, the court noted the district court's decision "speaks of an agent of [the parent corporation] alone who played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant." (*Bestfoods*, *supra*, 524 U.S. 51 at p. 72.) This agent, Williams, the parent corporation's governmental and environmental affairs director, "worked only for [the parent corporation]; he was not an employee, officer, or director of [the subsidiary], [citation], and thus, his actions were of necessity taken only on behalf of [the parent]. The District Court found that '[the parent corporation] became directly involved in environmental and regulatory matters through the work of . . . Williams, . . . [who] became heavily involved in environmental issues at [the subsidiary].' [Citation.] He 'actively participated in and exerted control over a variety of [the subsidiary's] environmental matters,' [citation] and he 'issued directives regarding [the subsidiary's] responses to regulatory inquiries,' [citation]." (*Ibid*.) The court concluded "these findings are enough to raise an issue of [the parent's] operation of the facility through Williams's actions" and remanded the matter with instructions to return it to the District Court "for reevaluation of Williams's role, and of the role of any

18

other [parent corporation] agent who might be said to have had a part in operating the [polluting] facility." (*Id.* at pp. 72-73.)

## D.

### *Analysis*

The evidence presented below is sufficient to support the trial court's conclusion that International/Anaconda directed operations at the Walker Mine specifically related to pollution. We decline to recapitulate the correspondence recounted previously. The following outline of its contents will suffice. While the correspondence from late 1923 to the middle of 1925 is somewhat ambiguous with respect to whether "recommendations" made by agents of International/Anaconda were in fact "instructions," it appears that managers at the Walker Mining Company were not following them regardless of what we call them. However, beginning in August 1925, after the Walker Mining Company's manager position transitioned from Hart to Greninger to Tunnell, an agent of International, Lyon, with no position at the Walker Mining Company, began approving recommendations made by Tunnell with respect to specific mining activity at the Walker Mine. Agents of International/Anaconda continued approving specific mining recommendations made by agents of the Walker Mining Company after the mine temporarily closed during the Great Depression. Hartmann and Droubay, the Walker Mining Company's manager and chief engineer/geologist, respectively, received approvals and disapprovals of specific mining activity from Lyon, Sales, and/or Weed, none of whom had any official role at the Walker Mining Company. The correspondence makes clear that mining activity at the Walker Mine was being conducted at the direction of these agents of International/Anaconda. This is precisely the sort of eccentric control that was at issue in *Bestfoods*.

Nevertheless, ARCO argues that this evidence merely establishes the "typical parent-shareholder advice, consultation and financial oversight that cannot constitute eccentric control." In making this argument, ARCO relies primarily on *Trinity*

19

*Industries, Inc. v. Greenlease Holding Co.* (3d Cir. 2018) 903 F.3d 333 (*Trinity Industries*) and *Atlanta Gas Light Co. v. UGI Utilities, Inc.* (11th Cir. 2006) 463 F.3d 1201 (*Atlanta Gas Light*). Such reliance is misplaced.

In *Trinity Industries*, the Third Circuit Court of Appeals affirmed the district court's determination, on summary judgment, that parent corporation Ampco-Pittsburgh Corporation (Ampco) was not directly liable for lead contamination at its subsidiary Greenlease Holding Co.'s (Greenlease) North Plant. (*Trinity Industries*, *supra*, 903 F.3d at p. 360.) The court explained: "The District Court rightly determined that the record here would not permit a reasonable fact-finder to conclude that Ampco's involvement in the day-to-day operations of the North Plant exceeded 'the normal relationship between parent and subsidiary,' [citation], in a manner that would support holding Ampco directly liable for Greenlease's conduct. The undisputed facts establish, rather, that '[Greenlease] employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations.' [Citation.] Greenlease employees, not Ampco employees, coordinated disposal with outside contractors and communicated with [state regulators] on environmental matters. In fact, Ampco 'did not employ any engineers or persons with technical experience in manufacturing that could make decisions for [Greenlease] with respect to environmental compliance or waste management.' [Citation.] Instead, 'Ampco employed only a professional staff, such as accountants, actuaries, and lawyers[.]' [Citation.] Helping with administrative work is consistent with a typical parent-subsidiary relationship, and certainly does not establish Ampco's direct involvement with the North Plant, which *Bestfoods* demands to hold a parent directly liable for environmental cleanup costs." (*Id*. at p. 364.) The court also rejected the argument that Ampco "crossed the line into operating the North Plant" (*id.* at p. 364) by providing Greenlease with advice regarding the laws and regulations related to Greenlease's waste generation, monitoring that waste generation, and also becoming

20

involved in plans to increase production capacity and modernize the North Plant. (*Id.* at pp. 343, 364.) The court viewed such activities as " 'consistent with the parent's investor status . . . .' " (*Id.* at p. 364, quoting *Bestfoods*, *supra*, 524 U.S. at p. 72, fn. omitted.)

Here, International/Anaconda did more than provide administrative assistance, offer financial and legal advice, and monitor the activities of their investment, the Walker Mining Company. Unlike Ampco, International/Anaconda did employ persons with technical experience in copper mining. As we have explained, these individuals directed specific mining activities at the Walker Mine, and they did so wearing only the hat of their employer, International and Anaconda, respectively. *Trinity Industries* is therefore inapposite.

In *Atlanta Gas Light*, the Eleventh Circuit Court of Appeals affirmed the district court's determination, also on summary judgment, that parent corporation CenterPoint Energy Resources Corporation (CenterPoint) was not directly liable for pollution at its subsidiary St. Augustine Gas and Electric Light Company's (St. Augustine Gas) manufactured gas plant. (*Atlanta Gas Light*, *supra*, 463 F.3d at p. 1208.) The court was not persuaded by the argument that CenterPoint's actions of replacing St. Augustine Gas officers and directors with CenterPoint senior executives and entering into engineering and management contracts with St. Augustine Gas rendered CenterPoint an operator of the plant within the meaning of *Bestfoods*. (*Id.* at p. 1206.) With respect to the overlapping officers and directors, the court explained this was "not inconsistent with corporate norms." (*Id.* at p. 1207.) Turning to the engineering and management contracts, the court explained the former contemplated "general engineering advice and assistance," as well as "design, supervision and construction on substantial additions, extensions and alterations," but did not contemplate "operation of the plant." (*Ibid*.) The latter contract, although "labeled a 'management' contract," was rather "in the nature of advice and consultation." (*Ibid*.) Moreover, while a CenterPoint officer, Traver, with no apparent official role at St. Augustine Gas, described himself as "the 'sponsor' and

21

'engineer' for the St. Augustine Gas plant," the court viewed his testimony delineating his role as being "consistent with the above description of the contracts," i.e., "he consulted by telephone with the local management . . . 3-4 times per week" and "made an on-site visit . . . 6-7 times a year," but "did not operate the St. Augustine facility" on behalf of CenterPoint. (*Id*. at pp. 1207-1208.)

Here, again, Lyon, Sales, and Weed did more than consult with Walker Mining Company management and offer their advice with respect to exploration and development at the Walker Mine. That may have been how the relationship began. As stated previously, from late 1923 to the middle of 1925, it appears that managers at the Walker Mining Company were not following the "recommendations" or "instructions" of International/Anaconda, to the great consternation of the parent companies. By August of 1925, however, agents of International/Anaconda were actively directing specific mining activities at the mine.

ARCO further argues that even if International/Anaconda can be said to have directed operations at the Walker Mine, they did so only with respect to "the exploration and development phases of mining," and these phases did not result in pollution. We are not persuaded.

ARCO relies on testimony from its mining and geological experts, Terry McNulty and Marc Lombardi. Their relevant testimony, as summarized by ARCO in the opening brief, was as follows: "[T]he exploration phase constitutes the extraction of core samples to 'delineat[e] the three dimensional geometry and grade of the ore' [citation], followed by the development phase 'to create a path through the country rock adjacent to the vein.' [Citation.] Development can include sinking 'vertical shafts' from the ground surface [citation], or driving horizontal openings referred to as 'drifts or crosscuts,' 'inclines or declines' or 'raises or winzes' off of 'a haulage tunnel to a location near or in mineralization.' [Citation.] [¶] Ore extraction, however, as Dr. McNulty explained, refers to 'breaking and removing ore from the mine workings.' [Citation.] Miners drill

holes into the mineralized rock, blast the mineralized rock and load the broken mineralized rock into rail cars to tram to the surface."

The structure of ARCO's argument is threefold. First, ARCO argues the trial court "erroneously combined the development and ore extraction phases" when it found that International/Anaconda "managed, directed, or conducted operations" at the Walker Mine that "occurred in phase three of mining, ore extraction, which activities resulted, at least in part, in the toxic discharge at issue in the [cleanup order]." ARCO then observes that all of the evidence relied upon by the trial court in support of that finding involves what ARCO's experts have labeled exploration and development, not ore extraction. Finally, ARCO argues there is no evidence in the record that agents of International/Anaconda told Walker Mining Company managers how to extract the ore once their "development" activities exposed that ore for extraction. From these points, ARCO concludes it cannot be held directly liable for the pollution.

This line of argument rests, however, on a faulty premise, that ore extraction, as defined by ARCO's experts, is the first phase of mining activity that can be considered "specifically related to" (*Bestfoods*, *supra*, 524 U.S. at p. 66) the pollution at issue in this case, i.e., acid mine drainage. Acid mine drainage is "acidic water that is created when sulfide minerals are exposed to air and water, producing sulfuric acid," which then drains from the mine into surface waters or seeps into the groundwater. Thus, it is not the *extraction* of ore that causes acid mine drainage, but rather the *exposure* of mineralized rock to air and water. Indeed, the extracted ore that is conveyed to the surface and carried away to be refined is necessarily no longer in the mine and cannot result in acid mine drainage. It is the exposed mineralized rock that is left behind that causes this pollution. We must therefore conclude that any activity that exposes such mineralized rock to air and water is specifically related to the pollution at issue in this case. This includes the "development" activities directed by International/Anaconda in this case.

23

In reaching this conclusion, we accept expert Lombardi's testimony that the "country rock" surrounding the ore and mineralized vein "has minimal sulfides" and therefore "doesn't weather to produce acid mine drainage." Thus, if the evidence was such that agents of International/Anaconda directed the Walker Mining Company to cut the various drifts, crosscuts, winzes, et cetera, in the country rock, close to the mineralized vein, but without exposing ore or mineralized rock within the vein, we might well agree with ARCO's position. But the very point of this "development" work was to expose the ore for extraction. A few examples from the correspondence in this case will make this clear. In his November 1924 letter to Wraith, Sales referred to this country rock as "waste" and complained that "drifts run in waste . . . should be *in ore*, or at least should be *in the vein . . . .*" (Italics added.) Thereafter, in August 1925, Lyon approved Tunnell's proposed "development work" with the caveat that "the work should all be done *in the vein*." (Italics added.) The following month, Lyon authorized Tunnell to "drift north and south *on the ore* disclosed by crosscut 647 S." (Italics added.)

Simply put, the entire point of the "development" work directed by agents of International/Anaconda was to expose ore for extraction. These same agents made the decision to abandon the mine once extracting that ore was no longer profitable, and further directed removal of the pumps that had previously kept water out of the mine. Acid mine drainage resulted.

For the foregoing reasons, we conclude the evidence is sufficient to support direct liability under *Bestfoods*.

## II

### *Expert Testimony*

ARCO also claims the Regional Board abused its discretion by failing to exclude certain expert testimony from Dr. Quivik under *Sargon*, *supra*, 55 Cal.4th 747, and therefore these improperly admitted opinions "cannot support the trial court's liability finding." Not so.

24

## A.

### *Additional Background*

Before the Regional Board, ARCO moved to exclude the following opinion testimony of Dr. Quivik: (1) "Anaconda . . . developed a tightly-managed corporate structure that allowed top managers of the parent corporation to direct the operations of several of its several subsidiaries and far-flung operations," including the Walker Mining Company; (2) "Although the Walker Mining Company had its own board of directors, corporate officers, and local managers, management of the Walker Mine was fully integrated into the Anaconda . . . enterprise and its management system, so that [Anaconda's] top managers in charge of geology, mining, and metallurgy directed activities at those area [*sic*] at the Walker Mine"; and (3) "[Anaconda] and its subsidiary International managed the Walker mine concurrently with the Walker Mining Company from 1918 to 1941." ARCO argued these opinions should be excluded under *Sargon* because they are speculative and rely on leaps of logic. ARCO also challenged testimony from Dr. Quivik about "other cases," including analogies Dr. Quivik drew between this case and "the Newmont Mining case," because unrelated cases "are completely irrelevant" to whether International/Anaconda directed operations at the Walker Mine.[4]

The Regional Board's legal counsel recommended denying the motion, explaining that Dr. Quivik's opinion testimony was "based on hundreds of individual documents in

---

[4] ARCO's position at the hearing was that it could not be held liable for the pollution at the Walker Mine unless its predecessors, International/Anaconda, managed or directed operations at the Walker Mine *specifically related to waste disposal*. With this as the focus, ARCO argued at the hearing that Dr. Quivik's testimony concerning "the control of waste" and "waste disposal activities" at the Walker Mine was "pure speculation" and assumed International/Anaconda controlled waste disposal "based on activities [involving] other spheres of mining." However, as we have explained, parental direction of activities in these other spheres of mining can support liability under *Bestfoods* as long as they are sufficiently related to the pollution at issue. In any event, these arguments are not renewed on appeal and shall be mentioned no further.

25

the record that were generated either by Anaconda's employees or Walker's employees" and was "also based in part on published [treatises] on the mining industry that were published contemporaneously with the activities in this case." Counsel also pointed out that "use of the historical method" employed by Dr. Quivik "has been applied in other federal environmental litigation lawsuits involving the very type of parent subsidiary relationships in the mining industry."

The Regional Board agreed with counsel's analysis and denied the motion, adding, "in addition to that, we have a very considerable body of evidence so to speak of -- I don't know how many letters are in this record of correspondence back and forth, which speaks to itself, even without Dr. Quivik's testimony."

ARCO renewed its challenge to Dr. Quivik's testimony before the trial court, both in its opening brief in support of its petition for writ of mandate and in its opening brief following our remand of the matter. The trial court rejected ARCO's renewed argument that Dr. Quivik's testimony should have been excluded because it " 'relied on unrelated cases and was speculative,' " explaining: "The Court has reviewed Dr. Quivik's report and testimony and finds the [Regional] Board did not err in denying the motion to exclude Dr. Quivik's opinion."

## B.

### *Analysis*

As a preliminary matter, we note that this contention is made by ARCO under a subheading of its first main argument that the trial court improperly applied *Bestfoods*, resulting in a liability finding that is unsupported by substantial evidence. However, even if we were to agree that the challenged opinion testimony should have been excluded, this would not mean the trial court's ultimate finding is unsupported by substantial evidence. For reasons already explained, even without this challenged opinion testimony, the evidence was sufficient to support the trial court's finding of liability under *Bestfoods*. And while our conclusion in that regard was based in part on Dr. Quivik's testimony that

26

Lyon, Sales, and Weed had no official role at the Walker Mining Company, that portion of Dr. Quivik's testimony was not objected to by ARCO, either before the Regional Board or before the trial court. Thus, even if that portion of Dr. Quivik's testimony was inadmissible, the general rule is that "inadmissible evidence . . . admitted without objection, is sufficient to sustain a judgment." (*Greenfield v. Insurance Inc.* (1971) 19 Cal.App.3d 803, 811; *Prentice v. Miller* (1890) 82 Cal. 570, 572-573.)

We therefore address this contention separately, solely as a claim of evidentiary error. We may reverse only if we conclude there was an abuse of discretion in admitting the challenged evidence and a corresponding reasonable probability of a more favorable outcome had the evidence not been considered by the trier of fact. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447, 1449.) We conclude there was no abuse of discretion.

As ARCO accurately observes, our Supreme Court has held "that the trial court has the duty to act as a 'gatekeeper' to exclude speculative expert testimony." (*Sargon*, *supra*, 55 Cal.4th at p. 753.) This gatekeeping duty arises out of Evidence Code sections 801 and 802, which require the trial court "to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon,* at pp. 771-772.) However, the court also cautioned that trial courts must be careful not to "choos[e] between competing expert opinions" under the guise of excluding unreliable or speculative opinion testimony: "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine

27

whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citation.]  The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion.  [Citation.]  In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'  [Citation.]" (*Id*. at p. 772.)

Here, Dr. Quivik, an industrial historian, relied on hundreds of primary historical sources, including correspondence from the relevant actors at Anaconda, International, and the Walker Mining Company, as well as reputable secondary sources, including the Engineering and Mining Journal, the principal trade journal for the mining industry in the United States, in order to develop general histories of these companies from the 1910's through the 1940's and also to form opinions regarding the relationship between them, specifically related to operation of the Walker Mine.  ARCO has not persuaded this court that these sources cannot provide a reasonable basis for the challenged opinions in this case.

Nor are we persuaded that the challenged opinions are based on a leap of logic. The testimony in this case is not like the speculative testimony at issue in *Sargon*.  There, on behalf of a small dental implant company suing a university for breach of contract, an expert sought to testify that the company would have become a worldwide leader in the dental implant industry but for the university's breach of contract, justifying damages for lost profits in excess of $200 million.  (*Sargon*, *supra*, 55 Cal.4th at p. 753.)  The trial court excluded the evidence as speculative.  Our Supreme Court agreed, explaining:  "An expert might be able to make reasonably certain lost profit estimates based on a company's share of the overall market.  But [the expert] did not base his lost profit estimates on a market share [the company] had ever actually achieved.  Instead, he opined that Sargon's market share would have increased spectacularly over time to levels

28

far above anything it had ever reached. He based his lost profit estimates on that hypothetical increased share." (*Id*. at p. 776.) And while the expert justified his assumption of increased market share based on the " ' "innovativeness" ' " of the company, the court adopted the trial court's reasoning that " 'there is no evidentiary basis that equates the degree of innovativeness with the degree of difference in market share,' " and therefore, the expert's opinion in this regard " 'has no rational basis.' " (*Id*. at p. 778.) Thus, while an expert may properly estimate lost profits based on market share, the leap in logic was that a high degree of innovativeness equates with a dramatically increased market share.

Here, Dr. Quivik did not engage in a similar leap in logic in concluding that Anaconda's corporate structure allowed its top managers to direct the operations of the Walker Mining Company, or that Anaconda's top managers in charge of geology, mining, and metallurgy directed activities in those areas at the Walker Mine, or that Anaconda and its subsidiary, International, managed the Walker Mine concurrently with the Walker Mining Company during the relevant time period. These opinions were directly based on Dr. Quivik's review of the primary and secondary sources indicated above. It was for the trier of fact to determine whether to credit them or not, but we cannot conclude it was an abuse of discretion to allow the testimony.

Nevertheless, ARCO argues Dr. Quivik's "reliance upon an unrelated contract between two unrelated companies–Newmont Mining Corporation and Dawn Mining Company–renders inadmissible his opinion about the relationship between [the Walker Mining Company] and Anaconda." Not so. Dr. Quivik noted that one of the primary sources he examined, a newspaper article from 1920, indicated there was a management contract between Anaconda and the Walker Mining Company under which Anaconda operated the Walker Mine during that time period. Dr. Quivik also noted that he had not seen the contract mentioned in the article, but indicated he had seen "such contracts in other episodes of U.S. mining history, most notably in the relationship between Newmont

29

Mining Corporation and its subsidiary, Dawn Mining Company." Dr. Quivik then moved on to other contemporaneous evidence of "Anaconda's management role" at the Walker Mine, occasionally comparing this role to Newmont's role in managing its subsidiary's mining operation. Dr. Quivik also discussed Newmont, as well as other mining companies, more generally in a section of his report titled "The Historical Context for Understanding Twentieth-Century Management of Large-Scale Mining Enterprises." Thus, Dr. Quivik did not speculatively assume, based on an unrelated contract between Newmont and Dawn, that Anaconda managed the Walker Mine. He instead came to this conclusion based on the various primary and secondary sources noted above and indicated this was consistent with what other mining companies were doing at the time. Reference to the Newmont-Dawn contract does not render Dr. Quivik's testimony speculative.[5]

Finally, ARCO claims that Dr. Quivik, "as a historian and not a geologist with first-hand mining experience, . . . lacks the necessary qualifications to offer opinions about the particulars of mine management." This claim is forfeited for failure to support it with reasoned argument and citation to relevant authority. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) The entirety of the "argument" is the conclusory statement that Dr. Quivik's lack of firsthand mining experience makes his opinion regarding the relationship between International/Anaconda and the Walker Mining Company "necessarily speculative and inadmissible under *Sargon*."

---

[5]     ARCO also asserts that Dr. Quivik's "reliance" on the Newmont-Dawn contract amounts to an admission that "he did not follow his own methodology," which "requires that unrelated material **not** be relied upon," and therefore, "his opinion [should have been] excluded as unreliable speculation." However, as we have explained, Dr. Quivik did not rely on this unrelated contract so much as reference it as part of the historical context of mining operations.

30

There was no abuse of discretion in allowing the admission of the challenged aspects of Dr. Quivik's expert testimony.

## III

### *Due Process Claim*

ARCO further asserts the Regional Board's actual financial bias in this matter requires invalidation of the cleanup order for violation of due process. We are not persuaded.

Our Supreme Court set forth the applicable due process principles in *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197 (*Today's Fresh Start*): "Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any property interest. [Citations.] In light of the virtually identical language of the federal and state guarantees, we have looked to the United States Supreme Court's precedents for guidance in interpreting the contours of our own due process clause and have treated the state clause's prescriptions as substantially overlapping those of the federal Constitution. [Citation.] [¶] 'The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it." ' [Citations.] The opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner.' [Citations.] To ensure that the opportunity is meaningful, the United States Supreme Court and this court have identified some aspects of due process as irreducible minimums. For example, whenever 'due process requires a hearing, the adjudicator must be impartial.' [Citations.]" (*Id*. at p. 212.)

"The requirements of due process extend to administrative adjudications." (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 214.) " 'When, as here, an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal. [Citation.] A fair tribunal is one in which the judge or other decision maker is free of bias for or against a party.' [Citation.] 'Of all the types of bias

31

that can affect adjudication, pecuniary interest has long received the most unequivocal condemnation and the least forgiving scrutiny.' [Citation.] The state and federal Constitutions forbid the deprivation of property by a judge with a ' "direct, personal, substantial, pecuniary interest in reaching a conclusion against" ' a party. [Citations.]" (*Id*. at p. 215.)

For example, in *Ward v. Village of Monroeville* (1972) 409 U.S. 57, a mayor, authorized by state statute to sit as judge in cases of certain traffic offenses, convicted the defendant of two such offenses and fined him a total of $100. (*Id*. at p. 57.) Revenue from the " 'mayor's court' " was conceded to provide " 'a substantial portion of the municipality's funds.' " (*Id*. at p. 59.) As the United States Supreme Court explained, whether this violated the defendant's right to due process depended on "whether the mayor's situation is one 'which would offer a possible temptation to the average [person] as a judge to forget the burden of proof required to convict the defendant, or which might lead him [or her] not to hold the balance nice, clear and true between the state and the accused . . . .' " (*Id*. at p. 60.) The court held that possible temptation plainly existed because "the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." (*Ibid*.; see also *Tumey v. Ohio* (1927) 273 U.S. 510, 521, 532 [mayor not impartial adjudicator of violations of prohibition laws where fines imposed for such violations made up substantial portion of the village treasury].)

Similarly, in *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, our Supreme Court held that the practice, adopted by some county governments, of selecting and paying temporary administrative hearing officers on an ad hoc basis violated due process because it created the risk that decisions favorable to the government would be rewarded with future work. (*Id*. at pp. 1020-1021.) The court explained that while "due process allows more flexibility in administrative process than judicial process, even in the matter of selecting hearing officers[,] . . . the rule disqualifying adjudicators with

32

pecuniary interests applies with full force." (*Id*. at p. 1027.) Thus, whereas an assertion of bias based on "the combination of investigative and adjudicative functions in administrative proceedings," must " 'overcome a presumption of honesty and integrity in those serving as adjudicators[,]' . . . the adjudicator's financial interest in the outcome presents a 'situation[ ] . . . in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' [Citation.]" (*Ibid*.)

An example of an administrative board with a disqualifying financial bias can be found in *Esso Standard Oil Co. v. López-Freytes* (1st Cir. 2008) 522 F.3d 136. There, Puerto Rico's Environmental Quality Board (EQB) issued a show cause order proposing a $76 million fine that would go "directly into an account administered by the EQB." (*Id*. at p. 145.) Relying on *Ward* and *Tumey*, the court held that a disqualifying financial bias arose from "the potential financial benefit to the EQB's budget as a result of an imposed fine," and explained: "This is not a situation in which the EQB Governing Board is so removed from the financial policy of the Special Account that such a presumption of bias is inapplicable. [Citation.] Rather, this is a case in which the EQB has complete discretion over the usage of those funds which are supplied, at least in part, by fines which it imposes. In this particular case, the possibility of temptation is undeniable and evident in the fact that the size of the proposed fine in this case is so unprecedented and extraordinarily large. The $76 million proposed fine—a sum twice the EQB's annual operating budget and 5,000 times greater than the largest fine ever imposed by the EQB—only intensifies the appearance of bias infecting the proceedings." (*Id*. at pp. 146-147.)

In contrast, in *Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812 (*Lent*), our colleagues at the Second Appellate District held the appellants, oceanfront landowners, did not carry their burden of demonstrating the California Coastal Commission (Coastal Commission) had such a disqualifying financial bias when it

imposed a penalty of more than $4 million for obstructing public access to the beach. (*Id.* at p. 853.) The court first noted that revenue generated from such a penalty was not collected by the Coastal Commission and was deposited in a Coastal Conservancy Fund account. (*Id.* at p. 851.) However, the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) requires the coastal conservancy to expend funds for carrying out the provisions of that act, and the Coastal Commission has primary responsibility for implementing the act. (*Lent,* at p. 851.) Thus, the statutory scheme allows the Coastal Commission, "with both executive and adjudicative functions," to "raise revenue by imposing penalties in adjudicative proceedings." (*Ibid.*) That alone was not enough to violate due process, however.

After discussing the relevant caselaw, including *Ward* and *Tumey*, as well as *Alpha Epsilon Phi Tau Chapter Housing Assn. v. City of Berkeley* (9th Cir. 1997) 114 F.3d 840, in which the Ninth Circuit "held a city's rent stabilization board that decided appeals over whether units were subject to the city's rent control ordinance was an impartial adjudicator, even though the board could impose fees and penalties to raise revenue," (*Lent*, *supra*, 62 Cal.App.5th at p. 852) the court explained:  "The Coastal Act places some check on the Commission's ability to use revenue derived from penalties . . . by requiring that the Legislature appropriate and the Conservancy expend the funds. [Citations.] More importantly, the [appellants] submitted no evidence in the trial court of how much money the Legislature generally appropriates or the Conservancy spends from the Violation Remediation Account to carry out the provisions of the Coastal Act. Nor did the [appellants] submit evidence of the Commission's annual budget or of how much of its budget (if any) the Commission generally receives from expenditures from the Violation Remediation Account. The Coastal Act may give the commissioners at least some incentive to impose substantial fines . . . , just as the budgetary system in *Alpha Epsilon* gave the board some incentive to recover registration fees and impose late payment penalties on landlords. [Citation.] But absent some additional evidence

34

showing how much the commissioners rely on the penalties to carry out their executive duty to implement the Coastal Act, we cannot determine whether the commissioners' motives are strong enough to reasonably warrant a 'fear of partisan influence' on the Commission's judgment or to cause the commissioners ' "not to hold the balance nice, clear, and true between the state and the accused." ' [Citations.]" (*Id*. at p. 853.)

Here, the asserted financial bias does not stem from the Regional Board imposing fines or penalties to fund its own executive functions. Indeed, a cleanup order issued under section 13304 does not impose a fine or penalty at all. Instead, as relevant here, it orders a "person who has . . . caused or permitted . . . any waste to be discharged or deposited . . . into the waters of the state," creating "a condition of pollution or nuisance," to "clean up the waste or abate the effects of the waste . . . ." (§ 13304, subd. (a).) Nevertheless, ARCO argues the abatement activities undertaken by the Regional Board at the Walker Mine, before issuing the cleanup order in this case, gave it a strong financial incentive "to shed liability" for its own pollution-causing activities by ordering ARCO to clean up the pollution.[6]

ARCO argues the Regional Board is partially responsible for the pollution for two reasons: (1) the Regional Board "assumed control of the mine decades ago and installed an adit plug that has exacerbated the contamination and is causing the pollution to impact groundwater and surface water"; and (2) the Regional Board "assumed additional liability

---

[6] ARCO misleadingly states that the trial court "correctly found that the [Regional] Board is liable for its portion of contamination at the [Walker Mine]." The trial court made no such finding. After finding eccentric control, and noting in a footnote that "ARCO raises the issue of bias and adjudication by an improper tribunal," the trial court noted "prospectively the [Regional] Board appears to be an improper adjudicator of apportionment because the [Regional] Board would not stand in a neutral position sufficient to provide a fair and impartial hearing" on the issue of apportioning cleanup costs due to its "possible financial exposure." The trial court did not conclude any actual exposure existed. In any event, as ARCO correctly observes, "[t]his court's review on this issue is *de novo*; therefore, no deference is owed to the trial court's [determination]."

when settling with and agreeing to hold harmless other parties," specifically, intervening owners of the Walker Mine. We disagree.

The Regional Board authorized remediation work at the Walker Mine in 1986 pursuant to section 13305, which "provides a mechanism under which a [regional water board] may abate water pollution emanating from nonoperating industrial or business locations." (*People ex rel. Cal. Regional Wat. Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 161.) Since at least 1991, the State Water Resources Control Board (State Water Board) has funded the Regional Board's remediation activities at the Walker Mine, including installation and maintenance of the adit plug, from the State Water Pollution Cleanup and Abatement Account in the State Water Quality Control Fund. (See §§ 13440, 13442.) To be sure, requiring ARCO to clean up the pollution at the Walker Mine will benefit this account by stopping expenditures for purposes of remediation work at the mine, but this account is administered by the State Water Board, not the Regional Board. Thus, unlike *Ward*, *Tumey*, *Lopez-Freytes*, and even *Lent*, there is no evidence the cleanup order benefits any fund or budget over which the Regional Board exercises any amount of discretion.

With respect to the assertion that the Regional Board exacerbated the pollution at the Walker Mine by installing the adit plug, and therefore had a financial interest in shifting the costs of cleaning up its own pollution, we conclude ARCO has not carried its appellate burden of demonstrating this to be the case. Our review of the record reveals that the adit plug "successfully eliminated most or all of the direct discharge of [acid mine drainage] and metals through the 700 level adit" and "dramatically reduced" the levels of copper in nearby waterways. And while ARCO's expert, Lombardi, testified at the hearing that the adit plug increased acid mine drainage into groundwater, which ultimately reached the surface streams, he also noted in his report that this is subject to dispute, pointing out that an independent study commissioned by the Regional Board, included as an addendum to the final feasibility study and design report for sealing the

36

mine, "suggests that the acid drainage that accumulates behind the plug would migrate out into the country rock where it would be neutralized and the copper precipitate out of solution prior to discharging to surface water." Indeed, about 60 percent of the inflow to the mine had already been discharging into bedrock since the mine closed in 1941, but there was "no evidence of a stream of copper-laden water egressing from the groundwater system to the surface water system." Moreover, while Lombardi disagreed with this assessment, his own report indicated "insufficient data have been collected for proper evaluation" of the issue. We conclude this showing is insufficient to demonstrate a disqualifying financial bias on the part of the Regional Board.

Finally, while the Regional Board also entered into two settlement agreements with Walker Mine property owners, in neither agreement does the Regional Board assume responsibility for any pollution caused by these settling property owners. ARCO's assertion of financial bias based on these agreements must therefore also fail.

ARCO has not persuaded this court that its due process rights were violated due to financial bias on the part of the Regional Board.[7]

---

[7] This conclusion makes it unnecessary to address ARCO's related argument that the Regional Board's financial liability for the pollution at the Walker Mine limits its remedy against ARCO to an action for contribution under section 13350. However, we do note the subdivision ARCO relies on for this proposition applies to "[a] person who incurs any liability established under this section" (§ 13350, subd. (i)) and section 13350 authorizes courts, regional water boards, and the State Water Board to impose monetary liability for various activities, such as violating a cleanup order. (§ 13350, subds. (a), (b), (d), (e).) Where such liability is incurred, subdivision (i) allows the person who incurred it to seek contribution "from a third party, in an action in the superior court and upon proof that the discharge was caused in whole or in part by an act or omission of the third party, to the extent that the discharge is caused by the act or omission of the third party, in accordance with the principles of comparative fault." (§ 13350, subd. (i).) No such liability has been incurred in this case. Section 13350 is therefore inapposite.

37

# IV

## *Joint and Several Liability*

Finally, we also reject ARCO's contention that the cleanup order erroneously imposed joint and several liability. ARCO argues section 13304, subdivision (a) "does not authorize making one party jointly and severally liable for all liabilities of all potentially responsible parties . . . ." The State Water Board has consistently disagreed with this assertion, explaining: "When releases from two or more different sources commingle, the State Water Board generally considers all responsible parties of the separate releases as jointly and severally liable for the commingled release. [Citation.] This is true where the releases originate from different properties or where the releases originate from the same property but at different times. All parties that contributed to the commingled release are generally considered liable until the entire commingled release requires no further action." (*Matter of the Petition of James Salvatore* (State Water Resources Control Bd., Nov. 5, 2013, Order No. WQ 2013-0109) pp. 10-11 [2013 Cal.Env Lexis 148]; see also *Matter of the Petition of Union Oil Company of California* (State Water Resources Control Bd., Apr. 19, 1990, Order No. WQ 90-2) p. 8 [1990 Cal.Env Lexis 23].) While "we are not bound by the legal determinations made by the state or regional agencies[,] . . . we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." (*Building Industry*, *supra*, 124 Cal.App.4th at p. 879, fn. omitted.)

We agree with the State Water Board's assessment of section 13304. As stated previously, subdivision (a) of this section provides in relevant part: "A person who has . . . caused or permitted . . . any waste to be discharged or deposited . . . into the waters of the state and creates . . . a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects of the waste . . . ." (§ 13304, subd. (a).) Thus, two elements are required: (1) causing or permitting the discharge; and (2) creating a condition of pollution or nuisance. (*San Diego Gas & Electric Co. v. San*

*Diego Regional Water Quality Control Bd.* (2019) 36 Cal.App.5th 427, 431 (*SDG&E*).)
We have already held ARCO's predecessors, International/Anaconda, exercised eccentric control over the Walker Mine causing the discharge of acid mine drainage. The second element, pollution or nuisance creation, does "not require proof that the defendant's act was a 'substantial factor' or 'but for' cause of the resulting [pollution or] nuisance." (*Id.* at pp. 438-439.) Instead, all that is required is that the pollution or nuisance was "the aggregate result" of all waste discharges. (*Hillman v. Newington* (1880) 57 Cal. 56, 59; *People v. Gold Run Ditch & Mining Co.* (1884) 66 Cal. 138, 148-149; *SDG&E, supra*, 36 Cal.App.5th at pp. 437-439.)

Where, as here, both elements are satisfied, the entity that caused or permitted the discharge may be ordered to clean up the waste or abate its effects. Nowhere in the statutory language does section 13304 say the polluting entity must clean up or abate *only* its proportionate contribution to that waste. To the extent ARCO cleans up more than its proportionate share of the acid mine drainage at the Walker Mine, it can seek contribution from other parties it believes also contributed to the pollution. (See, e.g., *Standun, Inc. v. Fireman's Fund Ins. Co.* (1998) 62 Cal.App.4th 882, 886 [businesses that paid cleanup costs imposed by the U.S. Environmental Protection Agency sued another business for contribution of its proportionate share of those costs].)

All that is required for this court to affirm the trial court's judgment upholding the Regional Board's cleanup order is for there to be substantial evidence of both elements of section 13304, subdivision (a). (See *Barclay Hollander, supra*, 38 Cal.App.5th at p. 498; *SDG&E, supra*, 36 Cal.App.5th at p. 431.) That standard is met.

The Regional Board was not required to apportion responsibility for the pollution in the cleanup order.

# DISPOSITION

The judgment is affirmed.  The stay of the cleanup order issued by this court on December 24, 2020, is hereby vacated.  The Regional Board is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　HOCH, J.



We concur:



/s/
DUARTE, Acting P. J.



/s/
EARL, J.